IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RANDOLPH MORRIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:19-CV-1239-BH |
| | § | |
| ANDREW M. SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent[1] |

**MEMORANDUM OPINION AND ORDER**

Based on the relevant findings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

**I.  BACKGROUND**

Randolph Morris (Plaintiff) seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner)[2] denying his claim for supplemental security income (SSI) under Title XVI of the Act. (doc. 3.)

**A.      Procedural History**

On January 7, 2016, Plaintiff filed his application for SSI, alleging disability beginning on January 1, 1992.  (doc. 15-1 at 197-205.)[3]  His claim was denied initially on April 28, 2016, and upon reconsideration on November 10, 2016.  (*Id.* at 75-85, 87-105.)  On December 15, 2016,

---

[1]By consent of the parties and the order of transfer dated August 12, 2019 (doc. 19), this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 122.) He appeared and testified at a hearing on November 21, 2017. (*Id.* at 36-74.) On June 7, 2018 the ALJ issued a decision finding Plaintiff not disabled and denying his claim for benefits. (*Id.* at 16-31.)

Plaintiff appealed the ALJ's decision to the Appeals Council on September 29, 2017. (*Id.* at 585.) The Appeals Council denied his request for review on August 10, 2018, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-10.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 3.)

**B.  Factual History**

    **1.  Age, Education, and Work Experience**

Plaintiff was born on December 9, 1957, and was 59 years old at the time of the initial hearing. (doc. 15-1 at 47-48.) He had an associates degree in social science but no previous work experience. (*Id.* at 48-49,71.)

    **2.  Medical Evidence**

On April 6, 2015, Plaintiff presented to Correctional Managed Care (CMC) for a mental health evaluation. (*Id*. at 348-352.) He reported experiencing depression, anxiety, mood swings, racing thoughts, auditory hallucinations, and paranoia. (*Id*.) He had a stable relationship with his family, denied any history of self-mutilation, mental health hospitalizations or treatment with psychotropic medications. (*Id*. at 349-50.) Examination revealed his posture/gait, attention, concentration, and recall/memory were normal, and he was oriented "X4." (*Id*. at 350.) His mood was euthymic and his affect was appropriate. (*Id*.) He was of average intelligence, his judgment and decision-making were normal, his social support was adequate, and he had responsible social maturity and normal social judgment. (*Id*. at 351.) Plaintiff was diagnosed with antisocial personality

2

disorder and referred to a psychologist and psychiatrist in the mental health department. (*Id*. at 352.)

On April 10, 2015, Plaintiff presented to CMC for an initial psychiatric evaluation. (*Id*. at 353-58.) He reported difficulty sleeping, depression, and seeing "colors out of the corner of [his] eyes." (*Id*. at 354.) When informed that he was not experiencing hallucinations and needed to see medical for any difficulty with his vision, he responded, "Well then I hear things." (*Id*.) He claimed to hear voices telling him he "need[s] to be out of prison." (*Id*.) Examination revealed that Plaintiff was oriented, had appropriate appearance, was cooperative, and had good eye contact; his mood was euthymic and his judgment was unimpaired. (*Id*. at 355.) His claims of auditory and visual hallucinations were found "not credible." (*Id*.) Plaintiff was diagnosed with situational stressors and referred for stress management counseling. (*Id*. at 356-57.)

In December 2015, Plaintiff was referred to CMC "to determine urgency of mental health needs." (*Id*. at 375.) He reported doing well and being able to manage his moods and thoughts without medication and denied experiencing hallucinations or suicidal or homicidal ideation. (*Id*.) Examination revealed normal grooming, cooperative attitude, appropriate affect, euthymic mood, normal coping ability, responsible social maturity, and normal social judgment. (*Id*. at 376-77.)

In March 2016, Plaintiff saw David Okumbor, M.D., for an internal medicine consultation. (*Id*. at 386.) He reported forgetfulness, headache, insomnia, and nervousness. (*Id*. at 387.) Physical examination revealed no spasm, palpatory tenderness, or edema in any upper extremities. (*Id*.) Plaintiff's spine showed no spasms or tenderness, with back extension of 25 degrees, back flexion of 90 degrees, left lateral flexion of 25 degrees, and right lateral fluxion of 25 degrees. (*Id*.) His motor strength was 5/5 in all extremities tested, he had good coordination and motion of hands and fingers. (*Id*. at 388.) Plaintiff had good grip strength and ability to reach, handle, finger, and feel.

3

(*Id*.) He had deep tendon reflexes 2+ in bilateral upper and lower extremities, and could ambulate effectively without assistive devices. (*Id*.)  He could sit, stand, move about, hear and speak well. (*Id*.) Dr. Okumbor opined that Plaintiff's ability to lift, carry and handle objects was limited by bilateral hand pain. (*Id*.) X-rays of Plaintiff's left foot were normal, and no fractures or dislocations were seen in x-rays of his right foot, although there were metallic fragments in the region of the fifth metatarsal head from a remote gunshot wound injury, with no radiographic evidence of complications. (*Id*. at 384-85, 388.)

In April 2016, Plaintiff met with Deborah Whitehead Gleaves, Ph.D., for a psychological consultation. (*Id.* at 396-401.)  He traveled to the appointment by public transportation, he was dressed appropriately for his age, his overall grooming was neat and tidy, his speech was clear and coherent. (*Id*. at 396.) He made good eye contact and was cooperative, but obviously depressed and anxious. (*Id*.) He sought evaluation for disability due to problems with concentration and memory. (*Id*.) When asked why he was unable to work, he stated, "[m]ostly my background and my age keep me from working. But I'm having some problems with memory and concentration and with walking." (*Id*.) Plaintiff lived with his brother and reportedly stayed primarily at the house to avoid any confrontation with others. (*Id*. at 397) While at home he cleaned the house and helped with yard work. (*Id*.) He was independent with his basic activities of daily living, including taking his medication and making his own appointments. (*Id*. at 398.)  Plaintiff attended church, had a good relationship with his brother, and had no friends. (*Id*. at 398.)  During his mental examination, Plaintiff could repeat 5 digits forward and 3 backwards, and he learned a list of three words after one minute and could recall two of the three words after a five-minute interval. (*Id*. at 399.)

Dr. Gleaves diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed

mood. (*Id*. at 400.) She noted that he had difficulty with anxiety, agitation, depression, and irritability since being incarcerated, and that his problems with concentration and memory were probably related to his emotional distress. (*Id*.) His prognosis was guarded, and his long history of incarceration would make it difficult for him to adjust and get a job. (*Id*.) Dr. Gleaves found that Plaintiff had the functional capacity to understand, carry out and remember one and two-step instructions. (*Id*.) He would have moderate difficulty with complex instructions, and his ability to sustain concentration and persist in work related activity at a reasonable pace was moderately impaired. (*Id*.) His ability to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers and the public, and to deal with normal pressure in the competitive work setting, was moderately to markedly impaired. (*Id*.)

On February 17, 2016, Plaintiff presented to Metrocare Services (Metrocare) for a psychiatric diagnostic evaluation with medical services. (*Id*. at 447-450.) He complained of depression, trouble sleeping, and nightmares. (*Id*. at 447.) He was adequately groomed, his behavior was cooperative, his thought processes were organized, he was depressed, and he had normal attention and intact memory. (*Id*. at 448.) Plaintiff was assessed with major depression with psychosis. (*Id*.) He was prescribed Sertraline for depression and Mirtazepine for sleep. (*Id*.)

In March 2016, Plaintiff presented to Metrocare for a follow up. (*Id*. at 452.) He was adequately groomed, cooperative, and had normal speech. (*Id*. at 452, 454.) His affect was euthymic, but he reported continuing to have nightmares and trouble sleeping. (*Id*.) He was assessed with major depression and referred to Parkland for a follow up and social services as needed. (*Id*. at 453.) At a follow up in May 2016, Plaintiff was adequately groomed and cooperative, with normal speech. (*Id*. at 454.) He reported continued trouble sleeping and nightmares. (*Id*.) His assessment

5

remained the same, and he was referred to Parkland for a medical follow up. (*Id*. at 455.)

On July 12, 2016, Plaintiff presented to Metrocare for depression. (*Id*. at 460.) He reported delusions/paranoid thinking that people are trying to harm or hurt him, low energy, and decreased ability to concentrate. (*Id*.) He went into the exam room looking to see if the clinician had anything that would hurt him. (*Id*. at 459.) He appeared adequately groomed, his behavior was cooperative, his mood was depressed, and his affect was euthymic. (*Id*.) Plaintiff was assessed with major depression with psychotic features. (*Id*. at 460.) At a follow up in August 2016, he was cooperative, adequately groomed, and appeared paranoid; his mood was good and his affect was euthymic. (*Id*. at 463.) No anxieties were observed. (*Id*.) Plaintiff was assessed with major depression and continued on his medication. (*Id*. at 464.)

In September 2016, Plaintiff had a consultation with Mahmood Panjawani, M.D., for hand, back, and shoulder pain. (*Id*. at 481-486.) X-rays of his lumbosacral spine revealed "no lumbosacral spine fracture or dislocation." (*Id*. at 481.) The "disk spaces [were] preserved," the posterior elements were intact, and the soft tissues were unremarkable. (*Id*.) His lumbosacral spine series was normal. (*Id*.) No fractures or dislocations were seen in either hand. (*Id*. 482-83) Articular surfaces and soft tissue were unremarkable. (*Id*.)

### 3. Hearing

On July 26, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 44-80.) Plaintiff was represented by an attorney. (*Id.* at 46.)

#### a. Plaintiff's Testimony

Plaintiff testified that he was 6'0" tall, approximately 145 pounds, 59 years old, and right-handed. (*Id.* at 47-48.) He lived with his brother, had not worked since his release from prison, and

had not collected any unemployment or worker's compensation benefits. (*Id.* 49,57.)

Plaintiff testified that he was physically and verbally abused in prison. (*Id*. at 50.) He had torn ligaments, could not reach his hand behind his back, and had high blood pressure and arthritis in his fingers, hands, knees, and toes. (*Id*. at 51.)  About once a week, but more often when the weather was hot, he experienced chest pain which he rated at seven or eight on a scale of ten. (*See id*. at 54.) The pain in his hands was a five out of ten, and the pain in his legs down to his toes was a ten out of ten. (*Id*.) He testified that he heard voices, but medication helped. (*Id*. at 57.)

Plaintiff could care for himself, and he helped clean the house and washed dishes, but he did not cook much. (*Id*. at 58.) On a typical day, he would listen to music, watch television, and "write a[n] old friend from prison." (*Id*.)  Because he was on parole, he wasn't able to leave the house unless it was on his schedule. (*Id*. at 59.) He believed he couldn't work because he had blackouts and dizzy spells three to four times a week, and he had fallen "a couple times since [he had] been out here." (*Id*. at 59,63.) He could sit for three to four hours and could not stand for "too long," but he could walk almost a mile. (*Id*. at 60.) He could carry approximately eight  pounds and tried to avoid taking the stairs.  (*Id.* at 61.)  He also tried to keep to himself because he didn't "know right from wrong" and was "very low on the social scale" because was hard for him to trust people. (*Id.*)

Plaintiff testified that he could follow orders and might be able to do what a supervisor told him to do, although not in the way the supervisor wanted, because he might "have to take a break" and didn't have "the strength to do it." (*Id*.)  If he had to work, he preferred to work alone. (*Id*. at 62.) He was depressed and frustrated "because [he's] seeking justice." (*Id*.)

When questioned by his attorney, Plaintiff testified that although he completed college in prison, he didn't read well, didn't know how to operate a computer, and had bad eyesight. (*Id*. at

7

63,65.) He took the bus for transportation and missed stops because he was fatigued and would fall asleep. (*See id*. at 65.) He was diagnosed as a paranoid schizophrenic, which he thought could be accurate because he didn't trust many people. (*Id*.) In prison, he worked sweeping but was allowed to take breaks as needed. (*Id*. at 66.) He had shoulder pain and couldn't reach around behind his back with his left arm, and he could only raise his left hand up even to his face. (*Id*. at 67.)

### b.   VE's Testimony

Plaintiff did not have any past relevant work. (*Id*. at 69.) The VE testified that a hypothetical individual 58 to 59 years old, with a social sciences associates degree obtained in prison did not have a direct entry into skilled work, considering the "length of when he obtained it." (*Id*. at 70.)

The VE considered a hypothetical individual who could perform work at the medium exertional level, lifting and carrying 50 pounds occasionally and 25 pounds frequently; could stand for a total of six hours in an eight-hour work day; should avoid concentrated exposure to respiratory irritants; could understand, remember and carry out simple instructions; and perform routine tasks. This individual could perform repetitive tasks, but should never have contact with the public; could accept instruction and respond appropriately and occasionally to coworkers as long as he did not have to cooperate closely with them as part of a team; and was able to respond to usual work situation and deal with changes in a routine work setting. (*Id*. at 70-71.)  There were three medium unskilled jobs that the individual could perform, including an industrial cleaner, DOT 381.687-017 (SVP 2, medium), with approximately 1 million jobs nationally; laundry worker, DOT 361.685-018 (SVP 2, medium), with approximately 175,000 jobs nationally; and hand packager, DOT 920.587-018 (SVP 2, medium), approximately 676,000 jobs nationally. (*Id.* at 71.)

The VE considered a second hypothetical with the same limitations as the first, but adding

8

occasional handling and fingering. (*Id.*) There would not be any jobs that the person could perform at the medium exertional level. (*Id.*)

In response to questioning by Plaintiff's attorney, the VE testified that the hypothetical person working as an industrial cleaner or laundry worker would have some exposure to chemicals, but not to the level of atmospheric conditions that would cause respiratory distress. (*Id.* at 72.) If he was limited to only occasional use of the hands, the hypothetical individual would not be able to perform any of the jobs the VE previously listed. (*Id.*) A person who was off task more than 20% of the time due to pain on a consistent basis would be unable to sustain employment. (*Id.*)

**C.      ALJ's Findings**

The ALJ issued his decision denying benefits on June 7, 2018. (*Id.* at 16-31.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since January 7, 2016, the application date. (*Id.* at 19.) At step two, the ALJ found the following severe impairments: major depressive disorder with psychosis versus adjustment disorder with mixed anxiety and depression, mild emphysema, and remote gunshot wound to the fifth metatarsal head of the right foot. (*Id.*) Despite those impairments, at step three, he found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id.* at 20.)

Next, the ALJ determined that Plaintiff retained the RFC to perform medium work but must avoid concentrated exposure to respiratory irritants; he could understand, remember, and carry out simple instructions and perform routine and repetitive tasks. (*Id.* at 22.) He could never have contact with the public, he could accept instruction and respond appropriately and occasionally to coworkers as long as he did not have to cooperate closely with them as part of a team, and he could respond

9

to usual work situations and deal with changes in a routine work setting. (*Id*.) At step four, the ALJ noted that Plaintiff did not have any past relevant work experience. (*Id.* at 29.) At step five, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id*. at 30.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since January 7, 2016, the date the application was filed. (*Id.* at 31.)

## II. STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).[4] Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

To be entitled to social security benefits, a claimant must prove that he or she is disabled as

---

[4]The scope of judicial review of a decision under either the supplemental security income program or the social security disability program is the same. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of claims under either program are also identical, so courts may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to

show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1. Whether the ALJ erred in failing to account for all of the limitations reported by Dr. Gleaves whose opinion the ALJ found to be well supported and entitled to great weight.

2. Whether remand is warranted because the certified record is incomplete.

(doc. 26 at 1.)

### A. **Consulting Examiner's Opinion**

Plaintiff argues that the ALJ erred in failing to account for the limitations reported by Dr. Gleaves, whose opinion he found to be well supported and entitled to great weight. (*Id*. at 11.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id*. § 404.1527(c)(2).[5] A treating source is a claimant's "physician, psychologist, or

---

[5]On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed his application before the effective date, the pre-2017 regulations apply.

12

other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id*. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id*.

13

at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458.

Here, Dr. Gleaves conducted a clinical interview of Plaintiff, who reported that he was unable to work mostly because of his background and age, and that he had "a couple of blackouts" in prison, problems with his short term memory, inability to recall information, and difficulty focusing and concentrating. (*Id*. at 396-97.) She noted that he was cooperative but obviously depressed and anxious. (*Id.* at 396.) Dr. Gleaves assessed him with adjustment disorder with mixed anxiety and depressed mood, and noted that his problems with concentration and memory were probably related to his emotional distress in adjusting "to the free world." (*Id*. at 400.) She opined that Plaintiff could understand, carry out and remember one and two-step commands, but would have moderate difficulty with complex instructions, and that his ability to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public, and deal with normal pressures in the competitive work setting, was moderately to markedly impaired. (*Id*.)

The ALJ thoroughly reviewed and analyzed Dr. Gleaves's opinions and determined that they were entitled to great weight. (*Id*. at 27.) He closely assessed her examinations of Plaintiff and detailed some of her specific findings in his decision, including her opinion that Plaintiff's ability to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public, and to deal with normal pressures in the competitive work setting, was

moderately to markedly impaired. (*Id.*) He also stated that her opinions were reflected in the mental components of Plaintiff's RFC. (*Id.*) The ALJ was not required to make specific findings regarding Dr. Gleaves's report, or to address each aspect of the record in detail. *See Vandestreek v. Colvin*, No. 7:14-CV-00001-O, 2015 WL 1239739, at *7 (N.D. Tex. Mar. 17, 2015) (the ALJ was not required to discuss every aspect of the treating physicians report because the ALJ's discussion clearly evidenced that he considered the report in his RFC determination); *see also Ramirez v. Colvin*, No. 2:12-CV-262, 2014 WL 1293888, at *10 (N.D. Tex. Mar. 28, 2014) ("Case law instructs that an ALJ need not explain in his or her written determination all evidence contained in the record.").

The ALJ clearly considered Dr. Gleaves's opinions and incorporated them into his RFC determination. After "careful consideration fo the entire record," he determined that Plaintiff had the RFC to perform medium work, he could never have contact with the public, and he could "accept instruction and respond appropriately and occasionally to coworkers so long as he does not have to cooperate closely with them as part of a team." (doc. 15-1 at 22.) The "ALJ is not required to adopt all of a doctor's findings when assigning that doctor's opinion great weight[.]"*Gaurkee v. Saul*, No. 7:19-CV-00001-O-BP, 2019 WL 7500458, at *3 (N.D. Tex. Dec. 19, 2019), *report and recommendation adopted*, No. 7:19-CV-00001-O-BP, 2020 WL 95681 (N.D. Tex. Jan. 7, 2020); *see also Robling v. Berryhill*, No. CV 18-6013, 2019 WL 4686827, at *3 (E.D. La. Sept. 26, 2019) ("The ALJ afforded great weight to the medical opinions of plaintiff's treating physicians and was not required to give weight to [the physician's] functional capacity evaluation. The ALJ need not address each aspect of the record in detail.").

Moreover, the ALJ noted that Plaintiff reported that he got along well with authority figures. (doc. 15-1 at 29.) In response to questioning about his reaction to a supervisor giving him an

15

assignment, he testified that he could follow orders. (*Id*. at 61.) The ALJ also noted that Plaintiff "stated at the psychological consultative examination that it was mostly his background and age that kept him from working, suggesting that his criminal background and history of incarceration are an impediment to his getting and keeping a job." (*Id*. at 29.) He found that this statement "indicates that there are reasons other than his impairments that have prevented him from working." (*Id*.)

In conclusion, because an ALJ is not required to adopt all of a doctor's findings when assigning that doctor's opinion great weight, and there is substantial evidence supporting the ALJ's RFC determination, there is no error in the ALJ's RFC assessment as it relates to Dr. Gleaves's opinions regarding Plaintiff's functional capacity.

**B.     Certified Record**

Plaintiff argues that remand is warranted because the certified record is incomplete. (doc. 26 at 14.)

Under 42 U.S.C. § 405, as part of the Commissioner's answer to a social security appeal, the Commissioner "shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based." "The Fifth Circuit has determined that trial courts should not reverse or remand determinations because documents are missing where the record contains enough evidence for the ALJ to make a determination." *Young v. Colvin*, No. 3:13-CV-03489-M, 2014 WL 4851565, at *33 (N.D. Tex. Sept. 30, 2014) (quoting *Quintanilla v. Astrue*, 619 F.Supp.2d 306, 325 (S.D.Tex.2008)). Rather, the touchstone is whether the administrative record that does exist permits meaningful judicial review. *Brady v. Apfel*, 41 F. Supp. 2d 659, 668 (E.D. Tex. 1999) (citing *Harrison v. PPG Industries, Inc*., 446 U.S. 578, 594 (1980)).

Here, the ALJ's decision stated that he considered the x-rays taken by Dr. Panjawani and the

16

findings in the record to determine that Plaintiff's back and hand pain associated with arthritis were not medically determinable impairments. (*Id*. at 20.) The x-rays showed "no lumbosacral spine fracture or dislocation. The intervertebral disk spaces [were] preserved and the posterior elements [were] intact." (*Id*. at 485.) Dr. Panjawani noted that Plaintiff's lumbosacral spine series was normal, no fractures or dislocations were seen in the left and right hand x-rays, and the articular surfaces and soft tissues in both hands was unremarkable. (*Id*. at 483, 486.) Plaintiff's hand series was also normal. (*Id*.) The ALJ's decision also noted Plaintiff's internal medicine consultative examination with Dr. Okumbor, which revealed no spasm, palpatory tenderness, or edema in his upper extremities. (*Id*. 24, 387.) His motor strength was 5/5 in all extremities tested, and he had good coordination and motion of the hands and fingers. (*Id*. at 388.)

Plaintiff contends that the ALJ erred because he "relied on an examination report that is missing from the administrate record." (doc. 26 at 14.) He contends that without Dr. Panjawani's actual examination report in the record, the court cannot determine whether there are any additional physical examination findings that would have demonstrated the existence of a medically determinable impairment of arthritis of the back and hands. (*Id*. at 15.) An allegedly partially incomplete record "is not a per se due process violation or legal error that automatically requires a remand." *Cruz v. Colvin*, No. CV M-14-780, 2016 WL 749674, at *5 (S.D. Tex. Jan. 21, 2016), *report and recommendation adopted*, No. 7:14-CV-780, 2016 WL 728182 (S.D. Tex. Feb. 24, 2016). Here, the 495 page record, including x-rays and consultative examinations from different doctors for the relevant period, contains enough evidence for the ALJ to make a determination. *See Quintanilla*, 619 F.Supp.2d at 325. Accordingly, remand is not required on this issue.

## IV.  CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, on this 19th day of October, 2020.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE